**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **BRENDA L. DUPUIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-cv-00307-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Carolyn W.* | ) | |
| *Colvin, Acting Commissioner of* | ) | |
| *Social Security*, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Brenda L. Dupuis appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  (DE 1).  For the following reasons, the Commissioner's

decision will be REVERSED, and the case will be REMANDED to the Commissioner for

further proceedings in accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

Dupuis applied for DIB and SSI in October 2011, alleging disability as of December 31,

2009, which she later amended to September 18, 2011.[2]  (AR 19, 44-45, 164-71, 184).  The

Commissioner denied Dupuis's application initially and upon reconsideration.  (AR 102-18).

After a timely request, a hearing was held on February 26, 2013, before Administrative Law

---

[1] All parties have consented to the Magistrate Judge.  (DE 11); *see* 28 U.S.C. § 636(c).

[2] This is Dubuis's second claim for disability benefits.  (DE 8 Administrative Record ("AR") 161).

Judge Maryann S. Bright ("the ALJ"), at which Dupuis, who was represented by counsel; Dupuis's boyfriend; and a vocational expert, Sharon Ringenberg (the "VE"), testified. (AR 40-92). On April 17, 2013, the ALJ rendered an unfavorable decision to Dupuis, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of sedentary jobs in the economy. (AR 19-32). The Appeals Council denied Dupuis's request for review (DE 1-15, 345-47), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Dupuis filed a complaint with this Court on October 3, 2014, seeking relief from the Commissioner's final decision. (DE 1). Dupuis argues that the ALJ: (1) failed to adequately account for the ALJ's finding that Dupuis had moderate limitations in concentration, persistence, or pace when crafting the residual functional capacity ("RFC") and the step-five hypotheticals; (2) improperly evaluated the opinions of Dr. Geeta Bisht and Dr. Jon Karl; and (3) improperly discounted the credibility of her symptom testimony. (DE 18 at 11-18).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Dupuis was 44 years old (AR 164); had a high school education and two years of college (AR 48, 247); had obtained a degree in medical assisting (AR 247); and had past work experience as a day care provider, home health aide, cashier, and a general laborer (AR 192). She alleges disability due to bipolar disorder, post traumatic stress disorder ("PTSD"), and degenerative disc disease. (DE 18 at 2).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 684-page administrative record necessary to the decision.

At the hearing, Dupuis testified that she lives in a two-story home with her boyfriend, together with his two children and her four children, who ranged in age from nine to 15 years old. (AR 46-47, 59). She obtained her degree in medical assisting in 2010 or 2011 and wanted to continue on to become an LPN or RN, but she could not afford to do so. (AR 48). She ran a daycare in her home on a full-time basis from 2006 to 2011; prior to that, her jobs were part-time. (AR 50-52). She stopped working in September 2011 after hurting her back. (AR 49, 52).

On a typical day, Dupuis helps her younger children get ready for school. (AR 65). She stated that she can shower on her own, but needs help getting dressed, particularly with starting her pants over her feet. (AR 66). She stated that her boyfriend does most of the cooking, cleaning, grocery shopping, and caring for pets. (AR 70). She drives a car when she is not on her pain medicine. (AR 47). Dupuis stated that she has one or two bad days a week, where she does not want to do anything or even get out of bed. (AR 69, 75).

When asked why she thought she could not work, Dupuis stated that she is in pain most of the day and that her medications make her very tired and sometimes dizzy; she naps throughout the day. (AR 52, 56, 72-73). Her back pain radiates into her left leg, and lying down intermittently throughout the day helps to relieve her pain. (AR 59, 61). Standing for long periods of time and walking for long distances is difficult (AR 52, 62); sometimes she uses a cane to climb stairs (AR 58-59). In addition to medications, Dupuis receives injections, which reduce her pain temporarily; she has tried physical therapy but found it unhelpful. (AR 58). Dupuis estimated that she could stand 30 to 45 minutes before needing to sit down and that she could sit for 45 to 60 minutes before needing to either stand or lie down. (AR 62). Additionally,

Dupuis stated that she gets migraine headaches twice a week, which have worsened since September 2011, and that a migraine causes her to lie down for two to three hours. (AR 57, 67-68).

Dupuis testified that her depression, anxiety, and mood swings have worsened along with her back pain. (AR 52, 60, 62, 68). She stated that she cannot go to stores or be around large groups of people, as she becomes hot and feels like she could faint. (DE 62-63). She reported that she has panic attacks every day, even when she stays at home all day (AR 63); her panic attacks have worsened since September 2011 (AR 65). She identified problems with her memory and in maintaining concentration and attention, particularly when on her medications.[4] (AR 65, 68, 73).

### B. Summary of the Relevant Medical Evidence

In August 2011, Dupuis was evaluated by Dr. Gregory Hoffman, an orthopaedic surgeon at ONE, for low back pain and left L4 radiculopathy with paresthesias, which worsened with ambulation and was alleviated by lying down. (AR 495). She was nontender to palpation and straight leg raises were negative; she had full range of motion in her hips and normal (5/5) muscle strength bilaterally in her lower extremities. (AR 495). An MRI showed degenerative disc disease at L4-5 with central disc protrusion and annular defect. (AR 496). Dr. Hoffman's impression was lumbar degenerative disc disease, lumbar pain, lumbar radiculitis, and lumbar spondylosis. (AR 496). He recommended activity as tolerated; referred her to physical therapy; prescribed Naprosyn, Flexeril, and Norco; and discussed referring her for a lumbar epidural. (AR 496). He released her to return to work with modified duties for two weeks: lifting less than

---

[4] Dupuis's boyfriend also testified at the hearing, essentially corroborating her testimony. (AR 76-82).

25 pounds, occasional walking, and no twisting or bending.  (AR 496).

Dupuis received six physical therapy sessions from August to September 2011.  (AR 483-94).  At her first session, Dupuis rated her pain as an eight on a scale of one to 10.  (AR 493).  At her second session, Dupuis's pain had reduced to a four or five, with no pain in her left leg.  (AR 491).  At her third session, Dupuis rated her pain as a six or seven but stated that ibuprofen reduced it to a four.  (AR 489).  After six sessions, Dupuis noted increased strength and flexibility and some decreased pain.  (AR 483).

Also in August 2011, Dupuis began participating in mental health counseling with Susan Tielker-Sharpe, a social worker and therapist.  (AR 542-44).  Dupuis saw Tielker-Sharpe three times in October 2011 and twice in January 2012.  (AR 538-44).

In September 2011, Dupuis saw Dr. Hoffman for reevaluation, reporting that her back and leg problems had acutely worsened in the past two weeks despite medications and physical therapy.  (AR 481).  On examination, Dupuis had full range of motion and negative straight leg raises; she was nontender to palpation.  (AR 481).  Strength testing in her left leg revealed profound nondermatomal weakness (3/5) and atrophy of her left quadricep.  (AR 481).  Dr. Hoffman ordered another MRI, stating that Dupuis's previous MRI findings did not explain her acute progressive left leg weakness.  (AR 482).

Dupuis returned to Dr. Hoffman later that same month, complaining of constant pain with numbness, tenderness, and stiffness in her low back; she rated her pain as a 10.  (AR 477).  Vicodin reduced her pain somewhat, but not enough.  (AR 477).  Physical examination findings were similar as at her last visit; recent MRI results were unchanged from her previous MRI.  (AR 477).  Dr. Hoffman prescribed Ultram and referred her to neurology, commenting that he did not

note any pathology that could be the etiology for her acute weakness. (AR 478).

In October 2011, Dr. Rebecca Posner of ONE saw Dupuis upon referral from Dr. Hoffman for pain management. (AR 470). An examination revealed normal gait, range of motion, and strength; Dupuis was nontender to palpation. (AR 471). However, spinal rotation and extension caused pain, and a straight leg raise test was positive on the left. (AR 471). Later that month, Dr. Posner performed an L4 and L5 epidural steroid injection. (AR 468). The following month, Dupuis complained to Dr. Posner of constant sharp and traveling pain, which she rated as a seven. (AR 555). Dr. Posner decided to hold off on additional injections, given that Dupuis reported no pain relief from the first one and it had caused Dupuis a migraine headache. (AR 555). Dupuis stated that the tingling sensation had ceased in her left leg since the injection, but that she still experienced intermittent leg weakness. (AR 555).

In December 2011, Dupuis underwent a physical examination by Dr. H.M. Bacchus, Jr., at the request of Social Security. (AR 503-04). Dupuis rated her pain as a nine without medication and a five with medication. (AR 503). On examination, Dupuis's gait was antalgic favoring her left leg, but still steady and sustainable for short periods of time; she was barely able to walk on heels and toes, tandem walk, hop, and squat. (AR 504). She exhibited range of motion deficits, and her muscle strength was 4/5 in her left leg; her sensation was intact. (AR 504). Dr. Bacchus's impression was degenerative disc disease, treated with pain medication; sacroiliac sprain; lumbar radiculitis per history; and depression, bipolar disorder, and anxiety, treated with medication. (AR 504). Dr. Bacchus concluded that Dupuis could work six to eight hours per day from a seated position, could stand for four hours, and could lift five pounds frequently and 25 pounds occasionally. (AR 504).

That same month, Dr. Ryan Oetting performed a mental status examination at the request of Social Security. (AR 499-501). Dr. Oetting observed that Dupuis presented with a neutral affect and that her thought processes were logical and sequential; Dupuis described her mood as "angry" and "useless." (AR 499). She was taking Zoloft and Lamictal as prescribed by her family physician and had been participating in counseling; she reported a history of depression and childhood abuse. (AR 499-500). She further reported difficulty sleeping, frequent irritability, poor concentration, and feelings of worthlessness; she had fleeting suicidal thoughts, but denied any hallucinations. (AR 501-02). Dr. Oetting concluded that Dupuis had the ability to perform jobs relating to her medical assisting degree, but that periods of depression, anxiety, family dysfunction, and back pain impeded her ability to maintain consistent work attendance. (AR 501). He assigned her a Global Assessment of Functioning ("GAF") score of 63 and diagnoses of PTSD and major depressive disorder, recurrent, chronic, moderate.[5] (AR 501).

Also in December 2011, Joelle Larsen, Ph.D., a state agency psychologist, reviewed Dupuis's record and completed a psychiatric review technique form, finding mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (AR 506-18). In her narrative, Dr. Larsen concluded that Dupuis's mental

_____

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Dupuis, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

health condition was non-severe.  (AR 518).  Dr. Larsen's opinion was affirmed by a second

state agency psychologist, Dr. J. Gange, in March 2012.  (AR 557).

In January 2012, Dr. M. Ruiz, a state agency physician, reviewed Dupuis's record and

completed a physical RFC assessment.  (AR 529-35).  Dr. Ruiz found that Dupuis could lift 10

pounds frequently and 20 pounds occasionally, stand or walk for six hours in an eight-hour

workday; sit for six hours in an eight-hour workday; occasionally climb, balance, stoop, kneel,

crouch, and crawl; occasionally reach overhead with the left upper extremity; and must avoid

concentrated exposure to wetness and hazards.  (AR 531-32).

That same month, Dupuis had a follow-up visit with Dr. Posner.  (AR 553).  Dupuis

reported that her pain, which she rated as a six, occurred with activity and was slightly improved,

but that she still had intermittent tingling in her legs.  (AR 553-54).  She said that she has slight

dizziness when taking Ultram, and Dr. Posner prescribed Hydrocodone.  (AR 553-54).  Physical

examination findings were unchanged since her last visit.  (AR 553).  Dr. Posner indicated that

Dupuis was employed part time, but was unable to work due to back pain.  (AR 553-54).  At

another visit that month, Dupuis stated that her pain was under control, rating it as a two or three

and describing it as bilateral, constant, and "dull and achy."  (AR 551).  Dr. Posner scheduled

Dupuis for bilateral hip injections.  (AR 551).

Also in January 2012, Dupuis was evaluated by Dr. Thomas Curfman, a neurologist, for

her back pain.  (AR 559).  Dupuis described constant "numbness" in her left hip and thigh that

was very painful and which bothered her more at night than when standing or walking.  (AR

559).  An examination revealed no muscle wasting or back pain; she exhibited a normal gait and

good toe, heel, and tandem walking.  (AR 560).  She had tenderness to palpation of her hip; a

straight leg raise was minimally positive, but a Patricks maneuver was much more painful. (AR 560). Dr. Curfman noted that there was evidence of connective tissue inflammation in her left hip, but no evidence of radiculopathy or spinal cord dysfunction; his impression was sciatica. (AR 560).

Dr. Posner administered two epidural steroid injections to Dupuis in February 2012. (AR 548, 618). In March 2012, Dupuis rated her pain as a five or six with no numbness or tingling; physical examination findings were unchanged. (AR 616-17). Dr. Posner referred Dupuis back to physical therapy, encouraged her to increase her exercise, and planned to wean her from narcotics to give her a break. (AR 616-17). In May 2012, Dupuis reported constant sharp, stabbing, and traveling pain, which she rated as an eight, and intermittent numbness and tingling; she had been weaned off all pain medications. (AR 614). Dr. Posner ordered a new lumbar MRI and prescribed Neurontin. (AR 614). At a second appointment in May, Dupuis's condition was unchanged, and Dr. Posner scheduled her for bilateral sacroiliac joint injections. (AR 606, 612).

In July 2012, Dupuis saw Dr. Geeta Bisht, a psychiatrist. (AR 576-79). Dr. Bisht assigned Dupuis a current GAF of 50 and diagnosed her with PTSD; major depressive disorder, recurrent, moderate; and general anxiety disorder. (AR 579). Dr. Bisht saw Dupuis six more times, assigning her GAF scores ranging from 50 to 55. (AR 565-67, 570, 573-75).

In August 2012, Dupuis returned to Dr. Posner, describing her pain as constant and rating it as an eight. (AR 604). She was still off of her pain medications, and physical examination findings were unchanged. (AR 604). Dr. Posner referred Dupuis back to Dr. Hoffman for another surgical evaluation. (AR 605). Dupuis asked to resume Vicodin, and Dr. Posner agreed. (AR 605).

Later that month, Dupuis was reevaluated by Dr. Hoffman. (AR 630-31). Her range of motion had decreased since her last visit, but her strength was 5/5; she was tender to palpation, and a straight leg raise test was positive. (AR 631). Dr. Hoffman referred her to Dr. Jon Karl for pain management and told her that she may be a candidate for a spinal restoration-disc injection system that was in the FDA-approval process. (AR 631).

In September 2012, Dupuis was evaluated by Dr. Karl at ONE. (AR 650). Dupuis rated her pain as a five, stating that it radiated from her back to her lower leg. (AR 650). Her gait was normal, but her spinal range of motion was limited by pain; a straight leg raise test on the left was positive. (AR 651). Dr. Karl wrote that, per Dr. Hoffman, Dupuis was not a good candidate for surgery due to her age. (AR 650). Dr. Karl prescribed Mobic and Vicodin and recommended that she perform activity as tolerated; he also administered an epidural injection later that month. (AR 642, 652).

The following month, Dupuis reported that for about two weeks after her epidural, she had experienced about 80 to 90 percent relief; however, her pain had then returned. (AR 639). Dr. Karl administered another injection in November 2012. (AR 637). Later that month, Dupuis reported that the last two injections relieved her pain by 80 percent, but that the most recent injection was starting to wear off. (AR 634).

In January 2013, Dupuis started counseling with Lorraine Mejer, a social worker and therapist in Dr. Bisht's office. (AR 564). She returned for a second appointment later that month. (AR 562). Mejer documented a GAF of 50 at each visit. (AR 562, 564). Mejer checked boxes on a form indicating that Dupuis had the following severe symptoms: agitation, anger, anxiety, chronic worrying, concentration, distractibility, reduced energy, guilt, negative mood,

family conflict, grief, impulsiveness, irritability, marital conflict, and panic attacks.  (AR 562, 564).

In February 2013, Dr. Karl completed a medical source statement on Dupuis's behalf. (AR 656-58).  He identified clinical findings of a positive straight leg raise on the left and limited lumbar range of motion, and symptoms of pain in the low back and left leg.  (AR 656). He described Dupuis's pain as a seven or eight in intensity and radiating to the posterior side of her left leg, stating that her pain would be severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks.  (AR 656-57).  He indicated that Dupuis experienced the following medication side effects that may have implications for working: sedation, weight gain, and impaired concentration.  (AR 657).  He identified positive objective signs of reduced range of motion, positive straight leg raise test on the left, and abnormal gait.  (AR 656).  He estimated that Dupuis could walk two blocks, sit for 20 minutes at a time, and stand for 30 minutes at a time; he further indicated that in an eight-hour workday, Dupuis could sit for about four hours and stand or walk for two hours.  (AR 657).  Dr. Karl also stated that Dupuis would need to walk around for five minutes every hour in an eight-hour workday; be able to shift at will between sitting, standing, or walking; and take 30 minute unscheduled breaks every four hours.  (AR 657).  He wrote that she could lift 10 pounds occasionally and 20 pounds rarely; twist occasionally; stoop, crouch, squat, or climb stairs rarely; but never climb ladders.  (AR 658).  He also estimated that Dupuis would be absent four days per month as a result of her impairments.  (AR 658).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On April 17, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 19-32). The ALJ noted at step one of the five-step analysis that Dupuis had not engaged in substantial gainful activity since her alleged onset date of September 18, 2011. (AR 21). At step two, the ALJ found that Dupuis had the following severe

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

impairments: bipolar disorder, anxiety, and degenerative disc disease. (AR 21).

At step three, the ALJ concluded that Dupuis did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 22). Before proceeding to step four, the ALJ determined that Dupuis's symptom testimony was not credible to the extent it was inconsistent with the following RFC:

> [T]he claimant has the [RFC] to perform less than the full range of sedentary work . . . , consisting of lifting and carrying up to ten pounds occasionally, and standing or walking for approximately two hours in an eight-hour workday, and sitting for approximately six hours in an eight-hour workday, with normal breaks. The claimant is also limited to only occasional climbing of ramps or stairs, but never climbing ladders, ropes or scaffolds. The claimant is further limited to occasional balancing, stooping, crouching, kneeling and crawling. She should also avoid concentrated exposure to slick and uneven surfaces, as well as unprotected heights. The claimant is capable of simple routine and repetitive tasks, but is restricted to work that involves brief, superficial interactions with co-workers, supervisors and the public. Superficial interaction is defined as occasional and casual contact not involving prolonged conversation or discussion of involved issues.

(AR 23).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Dupuis could not perform her past relevant work as a child care provider. (AR 30). At step five, however, the ALJ found that Dupuis could perform a significant number of unskilled sedentary jobs in the economy, including addresser, table worker, and optical final assembler. (AR 31). Therefore, Dupuis's applications for DIB and SSI were denied. (AR 31-32).

### C. The Assigned RFC and Hypotheticals to the VE Did Not Adequately Account for Dupuis's Moderate Deficits in Concentration, Persistence, or Pace

Dupuis first argues that the ALJ failed to adequately account in the mental RFC and step-five hypothetical for the ALJ's finding at step three that Dupuis had moderate deficiencies in maintaining concentration, persistence, or pace. Dupuis's argument has merit under Seventh

Circuit precedent, necessitating a remand of the Commissioner's final decision.

As explained earlier, "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "The RFC assessment must be based on *all* of the relevant evidence in the case record . . . ." SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Cases from the Seventh Circuit Court of Appeals "generally have required the ALJ to orient the VE to the totality of a claimant's limitations." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (citations omitted). "[The] cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *Id.*

More specifically, in *O'Connor-Spinner*, the Seventh Circuit concluded that the ALJ erred where he found that the claimant had moderate difficulties in concentration, persistence, or pace, but failed to specifically observe this limitation when posing hypotheticals to the VE at step five. 627 F.3d at 620-21. In doing so, the court acknowledged that it has not insisted "on a per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases." *Id.* at 619. The court explained:

> We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. We most often have done so when a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work.

627 F.3d at 619 (citing *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (upholding a hypothetical restricting the claimant to work involving low production standards and a low-stress environment, where the claimant's difficulties with concentration, persistence, or pace arose

from stress-induced headaches, frustration, and anger); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (allowing a hypothetical formulated in terms of "repetitive, low-stress" work to stand, where the claimant's deficits in concentration, persistence, or pace stemmed from a panic disorder); *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding that the ALJ's restricting the claimant from jobs "involving complex work processes or unusual levels of stress" adequately accommodated the claimant's concentration problems arising, in part, from a panic disorder)).

"In most cases, however, employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *Id.* at 620 (finding that a restriction to repetitive tasks with simple instructions did not necessarily account for the claimant's depression-related problems in concentration, persistence, and pace) (collecting cases); *see also Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014) (finding that a limitation to "simple, repetitive tasks" did not adequately account for the claimant's concentration problems arising from depression and borderline intellectual functioning); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (concluding that a limitation to unskilled work did not sufficiently account for the claimant's concentration problems stemming from depression and a psychotic disorder). "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985)).

"Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." *Id.* (alteration in original) (quoting SSR 85-15, 1985 WL 56857, at *6). "The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called 'low-stress' jobs." SSR 85-15, 1985 WL 56857, at *6. Accordingly, the RFC and hypotheticals "must account for *both* the complexity of the tasks and the claimant's ability to stick with a task over a sustained period." *Warren*, 565 F. App'x at 544 (emphasis added) (citations omitted); *see also Yurt*, 758 F.3d at 858 (articulating that an RFC for unskilled work "by itself does not provide any information about [the claimant's] mental condition or abilities").

Here, the ALJ concluded that Dupuis had moderate limitations in concentration, persistence, or pace. (AR 22-23). In making this finding, the ALJ elaborated: "The evidence in the record, including the testimony of the claimant at the hearing, shows that the claimant has some difficulty in sustaining focus, attention and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in work settings . . . ." (AR 22-23). The ALJ, however, did not expressly include this limitation in concentration, persistence, or pace in the RFC or the hypothetical to the VE. (AR 23, 83-86). Nor did the ALJ limit Dupuis to "low-stress work" or the equivalent. Instead, the ALJ assigned an RFC and posed a hypothetical to the VE limiting Dupuis to "simple routine and repetitive tasks" and

"brief, superficial interactions" with others.  (AR 23, 83-86).  Thus, under Seventh Circuit precedent, the RFC and hypotheticals appear deficient with respect to the ALJ's accounting for Dupuis's moderate deficits in concentration, persistence, or pace.

The Commissioner acknowledges that the ALJ did not include Dupuis's concentration, persistence, or pace difficulties in the RFC and the hypotheticals posed to the VE, but argues that findings as to the paragraph B criteria at step three are not an RFC assessment, but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  *See* SSR 96-8p, 1996 WL 374184, at *4.  The Commissioner then cites to case law for the contention that an ALJ is not required to include these preliminary findings in the RFC finding.  (DE 25 at 16 (citing *Klahn v. Colvin*, No. 13-C-165, 2014 WL 841523, at *17-18 (E.D. Wis. Mar. 4, 2014))).  While the ALJ may not be required to include these preliminary ratings in the RFC finding, the ALJ's decision must still be internally consistent, and it must provide a logical bridge for the reasoning in the decision.  *See Clifford*, 227 F.3d at 872 (The ALJ "must build an accurate and logical bridge from the evidence to his conclusion." (citations omitted)); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (articulating that the ALJ's decision must demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion).  Here, the ALJ's decision is not consistent, as the Seventh Circuit has "repeatedly rejected the notion that a hypothetical . . . 'confining the claimant to simple, routine tasks and limited interactions with others adequately captures . . . limitations in concentration, persistence, and pace.'"  *Varga v. Colvin*, 794 F.3d 809, 814-15 (7th Cir. 2015) (citations omitted).

The Commissioner further suggests that the ALJ never found that Dupuis had moderate difficulties with concentration, persistence, *and* pace, but rather found that Dupuis had moderate

difficulties with concentration, persistence, *or* pace. (AR 18). More specifically, the Commissioner argues that the ALJ's step-three finding and RFC reflect that Dupuis's limitations "were grounded in concentration, not persistence or pace." (DE 18 (citing AR 23, 25, 28-19)). But the Seventh Circuit has rejected this distinction, finding that "[t]he word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)" and "that 'or' is generally used in the inclusive sense." *Varga*, 794 F.3d at 815 (citations omitted). The Seventh Circuit explained that "the agency forms from which these terms emanate often lump concentration, persistence, and pace together as an umbrella category" for "one broad category of functioning." *Id.* at 815-16; *see Yurt*, 758 F.3d at 858 (treating "concentration, persistence, or pace" as a broad category of mental functioning).

Additionally, the Commissioner emphasizes that the ALJ restricted Dupuis to "work that involves brief, superficial interactions with co-workers, supervisors and the public" (AR 23), which was "an admitted source of stress and anxiety" for Dupuis (DE 25 at 18). In essence, the Commissioner is suggesting that the social limitation assigned by the ALJ adequately accommodates Dupuis's deficits in concentration, persistence, or pace. As a general premise, however, "[t]he ability to function in social settings and navigate workplace social interactions is very different from the ability to concentrate on individual work with a certain degree of success and productivity, and accounting for a limitation in the former area does not necessarily alleviate difficulties in the latter area." *Ittel v. Astrue*, No. 2:12-CV-096 JD, 2013 WL 704661, at *14 (N.D. Ind. Feb. 26, 2013); *see Varga*, 794 F.3d at 814-15 (concluding that a hypothetical restricting a claimant to "simple, routine tasks and limited interactions with others" does not adequately account for limitations in concentration, persistence, and pace). Nevertheless, where

a claimant's concentration problems are triggered by being around others, social limitations have been found to adequately account, at least in part, for the claimant's concentration deficits. *See, e.g.*, *Capman v. Colvin*, No. 1:13cv286, 2014 WL 4494421, at *2, 8-9 (N.D. Ind. Sept. 12, 2014) (finding that where a claimant's anxiety attacks occur when he is around people, an RFC limiting the claimant to "simple, routine tasks that do not require working with the public and no close proximity or cooperation with others" sufficiently accounted for a claimant's problems in concentration, persistence, or pace), *aff'd*, 617 F. App'x 575 (7th Cir. 2015).

Here, although the evidence indicates that Dupuis's anxiety intensifies when she has to leave home and be in proximity to others, Dupuis stated that she also has panic attacks while at home, explaining that she is "constantly worrying." (AR 63-65 (testifying that she has panic attacks every day, even when she does not leave home)). Additionally, Dupuis's concentration problems were linked to her pain and to the effects of her pain medication (AR 68, 73, 657); the ALJ, however, did not mention Dupuis's chronic pain in the hypotheticals. *Compare Gomez v. Colvin*, 73 F. Supp. 3d 921, 932 (N.D. Ill. 2014) (finding that the ALJ's limitation to unskilled, low-stress work did not account for the claimant's concentration problems, which stemmed from pain, rather than stress), *and Copeland v. Astrue*, 776 F. Supp. 2d 828, 845 (N.D. Ind. 2011) (remanding case where the ALJ did not orient the vocational expert to the claimant's moderate deficiencies in concentration, persistence, or pace resulting from her mental health function and chronic pain), *with Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009) (finding that the claimant's moderate deficits in concentration, persistence, or pace, which stemmed from his chronic pain syndrome and somatoform disorder, were adequately accounted for in a hypothetical for unskilled work where the ALJ included the claimant's chronic pain and

somatoform in the hypothetical).  Consequently, the Court is not convinced that a social limitation sufficiently alleviates Dupuis's deficits in concentration, persistence, or pace.  *See, e.g.*, *Yurt*, 758 F.3d at 859 ("[A]lthough the ALJ's hypothetical contained several limitations accounting for [the claimant's] difficulties in social functioning, the blanket statement that he could perform 'unskilled' work fails to accurately capture [the claimant's] documented difficulties with concentration, persistence, and pace.").

Therefore, on this record, the Court concludes that the RFC assigned by the ALJ and the hypotheticals posed to the VE do not adequately account for Dupuis's moderate difficulties in maintaining concentration, persistence, or pace.[7]  Accordingly, the Commissioner's final decision will be remanded for the purpose of reassessing Dupuis's RFC.[8]

## V.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion

---

[7] The Commissioner does not argue that the ALJ relied on the opinion of a medical source who "translated" Dupuis's mental limitations into an RFC for simple, routine, and repetitive tasks.  *Johansen*, 314 F.3d at 289.  Rather, the ALJ disagreed with the December 2011 opinion from Dr. Larsen, the state agency psychologist, who found that Dupuis had just mild deficits in concentration, persistence, or pace, and the ALJ instead concluded that "the medical evidence of record establishes significant mental limitations."  (AR 30).  There is another opinion of record from Dr. Larsen dated April 2008 from Dupuis's prior application that neither the ALJ, nor the Commissioner, discuss.  There, Dr. Larsen found that Dupuis had moderate deficits in concentration, persistence, or pace and offered a specific mental RFC of "retaining and following simple instructions."  (AR 418).  The ALJ, however, rejected a medical source opinion from April 2008 offered by Dupuis, finding it too "remote" because it was dated more than three years prior to her amended alleged onset date.  (AR 29).  As such, the Court views Dr. Larsen's April 2008 opinion—which was not discussed by the ALJ or the Commissioner and was from Dupuis's prior application—as also too remote to support the ALJ's RFC.

[8] Because a remand is warranted on this basis, the Court need not reach Dupuis's remaining arguments.

and Order.  The Clerk is directed to enter a judgment in favor of Dupuis and against the

Commissioner.

SO ORDERED.

Enter for this 30th day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge